IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| LAUREN LEE DAROMA, | ) | CASE NO. 3:25-cv-02460-JJH |
| | ) | |
| Plaintiff, | ) | JUDGE JEFFREY J. HELMICK |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | REUBEN J. SHEPERD |
| FRANK BISIGNANO, | ) | |
| Commissioner of Social Security | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I. Introduction

Plaintiff Lauren Lee Daroma ("Daroma") seeks judicial review of the final decision of the Commissioner of Social Security, denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act and Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). Because the Administrative Law Judge ("ALJ") applied proper legal standards, I recommend that the Commissioner's final decision denying Daroma's DIB and SSI be affirmed.

## II. Procedural History

Daroma protectively filed for DIB and SSI on June 9, 2021, alleging disability beginning May 28, 2021. (Tr. 59). These claims were denied initially on September 8, 2021, upon reconsideration on March 17, 2022, and in an ALJ decision dated September 30, 2022. (Tr. 59, 75). The Appeals Council denied review of the claim on July 12, 2023. (Tr. 80-82).

Daroma again protectively filed a claim for DIB and SSI on October 26, 2023, alleging a disability onset date of May 28, 2021. (Tr. 260). The claims were denied initially and on

reconsideration. (Tr. 87-102, 104-30). Daroma then requested a hearing before an ALJ. (Tr. 175-76). Daroma, represented by counsel, and a Vocational Expert ("VE") testified before an ALJ on January 27, 2025. (Tr. 37-55). On February 14, 2025, the ALJ issued a written decision finding Daroma not disabled. (Tr. 14-30). The Appeals Council denied her request for review on October 10, 2025, making the hearing decision the final decision of the Commissioner. (Tr. 1-6; see 20 C.F.R. §§ 404.955, 404.981). Daroma timely filed this action on November 13, 2025. (ECF Doc. 1).

## III. Evidence

### A. Personal, Educational, and Vocational Evidence

Daroma was born November 24, 1998. (Tr. 28). She was 22 years old on her alleged onset date, making her a younger individual age 18-49 according to agency regulations. (*Id.*). She has at least a high school education. (*Id.*). She has past relevant work as a day care worker, DOT #359.677-018, light exertional level, performed at the very heavy exertional level, with an SVP of 4. (Tr. 27).

### B. Relevant Medical Evidence

On May 19, 2021, Daroma appeared for an office visit with Jamie Reindel, APRN-CNP, complaining of an upper respiratory infection and pain and swelling in her left foot. (Tr. 683). The pain and swelling had been ongoing for the past week, though she denied any specific injury. (Tr. 684). She was assessed with left foot pain, swelling of the left foot, acute sinusitis, bilateral acute serous otitis media and acute non-recurrent maxillary sinusitis. (Tr. 687). That same day she also saw Timothy Mosher, APRN-CNP, reporting intermittent dizziness and weakness over the last couple of months. (Tr. 728).

Daroma presented to the St. Rita's Hospital Emergency Department on June 2, 2021, following a motor vehicle accident. (Tr. 724). She suffered abrasions after losing control of her car and hitting a telephone pole and was unsure of whether she had lost consciousness prior to the accident. (*Id.*). She stated that she had been awake when the accident occurred. (*Id.*). Daroma underwent a head CT that was found to be unremarkable. (Tr. 449-50).

In January 2020, during a visit to assess headache, Daroma's mother reported to Paige Leopold, APRN-CNP, that Daroma had staring spells and episodes of zoning out. (Tr. 450). CNP Leopold had previously prescribed Lamictal to address headaches and "abnormal EEG results", but Daroma had not started the medication due to fear of potential side effects. (*Id*.). The headaches later resolved. (*Id.*).

On June 3, 2021, Daroma returned to CNP Leopold after the motor vehicle accident. (Tr. 450-51). She reported intermittent episodes of dizziness, worse with standing, over the past 2-3 months. (*Id.*). CNP Leopold ordered an EEG to assess for seizure tendency, a tilt table test for vasovagal syncope, and a 30-day cardiac event monitor to screen for underlying occult arrythmia. (*Id.*). She restricted Daroma from driving, swimming, operating heavy machinery, or compromising heights until cleared. (*Id.*).

An EEG report on June 24, 2021 was deemed normal. (Tr. 717). Daroma had a cardiac event monitor between June 24, 2021 – July 7, 2021, which showed normal sinus rhythm and no correlation with symptoms. (Tr. 715). She also had an abnormal tilt table test that was found her symptoms to be "most consistent with neuro cardiogenic syncope". (Tr. 679). She was assessed with syncope and collapse at a follow-up appointment on June 24, 2021. (Tr. 714).

At a neurology appointment with Ali Almudallal, M.D. on August 6, 2021, Daroma was advised to take plenty of fluids and avoid standing for prolonged periods, and she was started on medications by her cardiologist. (Tr. 439).

On March 14, 2022, Daroma attended a mental consultative examination with Michael Wuebker, Ph.D. (Tr. 455-463). Daroma stated that she was seeking social security disability benefits due to “low pressure problems – learning disabilities.” (Tr. 455). She reported that she was a high school graduate, although she had been in special education classes, and had problems with reading, spelling and math. (Tr. 456). Daroma had stopped working after her motor vehicle accident, and indicated that when she did work, she felt that people stared at her and judged her. (*Id.*). Daroma had participated in some counseling as a juvenile, but not as an adult, and had never taken psychotropic medication. (Tr. 457). She denied any problems with depression, but did have daily problems with anxiety, and some problems falling and staying asleep. (*Id.*). Her Full-Scale IQ was measured at 73. (Tr. 458). She was assessed with other specified anxiety disorder and borderline intellectual functioning. (Tr. 462).

Daroma had a podiatry office visit with Shawn Ward, DPM, on June 20, 2022, who was treating her for pain in her left foot, other acquired deformities of left foot, acquired cavus foot deformity, peroneal tendonitis of the left lower leg and stress reaction of left foot. (Tr. 471). Examination notes indicate that she continued to have left foot pain and swelling since a stress fracture three years earlier. (*Id.*). A left foot x-ray showed no evidence of fracture and excellent alignment, but there were stress lines through the styloid process and questionable changes to the distal neck. (Tr. 473). Another left foot x-ray taken July 25, 2022 showed minimal soft tissue swelling but did reveal distal phalanx artifact that likely could represent convoluted distal phalanx fracture. (Tr. 477). An MRI of her left foot performed on August 9, 2022 showed

abnormal bone marrow signal intensity in the distal phalanx of the great toe suggesting nondisplaced fracture/stress related marrow edema and moderate soft tissue edema noted along the dorsal and lateral aspect of the foot. (Tr. 867).

At a September 1, 2022 appointment with Zoheir Abdelbaki, M.D., Daroma was assessed with shortness of breath on exertion and idiopathic hypotension. (Tr. 676).

A left ankle MRI performed on September 29, 2022 showed a small amount of fluid along the peroneus brevis and longus tendon sheaths; thickening at the insertion of the tibialis posterior tendon and a small amount of fluid that may represent tendinosis; thickening of and slightly increased signal intensity in the deltoid and posterior talofibular ligaments which may be sprained or partially torn; increased signal intensity of the soft tissues over the dorsum of the foot which may represent edema and/or cellulitis; increased signal intensity in the soft tissues over the lateral aspect of the ankle and hindfoot and to lesser extent the medial malleolus consistent with edema; and slightly increased fluid between the middle and lateral cuneiform bones. (Tr. 860).

Daroma attended a follow-up podiatry appointment on October 10, 2022, reporting pain from her left lateral ankle to her pinky toe, and that she continued to experience swelling in the foot. (Tr. 483). Her diagnosis was expanded to include fracture of toe of left foot, metatarsalgia of left foot, swelling of left lower extremity and tear of peroneal tendon of left foot. (*Id.*). She was referred for physical therapy and recommended to ice and off-load the foot. (Tr. 486).

On December 8, 2022, Daroma underwent a bone marrow aspiration, left tibia; left ankle arthroscopy with extensive debridement of synovitis; debridement and repair of the peroneal tendon via retubularization, left leg; and injection of bone marrow concentrate into peroneal tendon sheath and ankle joint, left leg. (Tr. 491).

On December 12, 2022, podiatry examination notes indicate that Daroma was using a scooter and a boot, and was doing well other than tenderness on the lateral aspect of her foot from the boot. (Tr. 494). However, on December 20, 2022, Daroma presented for a follow-up appointment complaining of swelling in the left leg that had been present for five days. (Tr. 649). That same day, Daroma underwent a VL duplex lower extremity venous procedure, left, which uncovered findings of acute deep venous thrombosis ("DVT") limited to the soleal vein and a solitary posterior tibial vein. (Tr. 498-99). She was started on twice daily Lovenox injections. (Tr. 650).

On January 27, 2023, Daroma presented to the St. Rita's Emergency Department complaining of a sharp pain in her chest that had occurred three times in one minute. (Tr. 641). She was assessed with atypical chest pain. (Tr. 647).

Daroma had a follow-up VL duplex venous procedure, left, on February 21, 2023, and ultrasound results were normal and confirmed no evidence of DVT. (Tr. 635-36).

Daroma had a left foot x-ray on April 17, 2023 that showed swelling in the interspace 1-2 around the second metatarsal, and inflammation within the medullary canal that could represent a stress fracture. (Tr. 515). A left foot MRI on May 16, 2023 showed moderate dorsal soft tissue swelling with no acute bony abnormality. (Tr. 829).

On July 31, 2023, Daroma presented to St. Rita's Emergency Department complaining of back and abdominal pain, with intermittent episodes of pains lasting for a "couple of hours" occurring over the last couple of months. (Tr. 606). On this particular day, the pain had not resolved as it normally does, and had remained at 7/10, rising to 11/10 at its worst. (*Id.*). Symptoms that normally accompany the pain, including nausea and vomiting were not present. (*Id.*). A thoracic spine x-ray revealed no acute bony abnormality, mild thoracic spondylosis and

mild dextroscoliosis. (Tr. 618). An abdominal ultrasound showed cholelithiasis, with a gallstone seen proximal to the neck of the gallbladder. (Tr. 589). The final emergency department impression included bilateral thoracic back pain, unspecified chronicity; elevated d-dimer; abdominal pain, epigastric; calculus of gallbladder without cholecystitis without obstruction; and nausea and vomiting. (Tr. 614).

On August 17, 2023, Jason Bowersock, MD, assessed Daroma with chronic calculus cholecystitis and obesity, and determined that she should be scheduled for robotic possible open cholecystectomy. (Tr. 594). Dr. Bowersock performed a robotic laparoscopic cholecystectomy on August 24, 2023. (Tr. 576). Postsurgical follow up on August 30, 2023 indicated the incisions were healing well without signs of infection; Daroma was instructed to continue wound care and lifting/activity restrictions, increase as tolerated. (Tr. 574-75).

Daroma attended an initial evaluation of her left lower extremity pain with Manu Aggarwal, M.D., of the Vein Care Center, on September 5, 2023. (Tr. 530). Daroma reported that her pain worsened with prolonged standing, walking or exercise, and improved with sitting and leg elevation. (*Id.*). She had seen limited improvement with conservative treatment measures including 20-30 mmHg compression stockings. (*Id.*). She was assessed with generalized edema, hereditary lymphedema and lymphedema, not elsewhere classified. (Tr. 534). A venous reflux evaluation performed on October 16, 2023 showed no significant venous insufficiency. (Tr. 556).

On November 16, 2023, Daroma had an initial counseling session with Jessica Archibald, LPCC. (Tr. 1213). Daroma reported having a lot of unexplained anger that she was taking out on her boyfriend and mother, as well as a long history of anxiety symptoms and communication issues. (*Id.*). At a January 10, 2024 counseling appointment, Daroma stated that she was experiencing increasing frustration and anxiety symptoms. (Tr. 1196). She further indicated at

her January 24, 2024 appointment that her primary stressor has been her physical health, including an eye infection and lymphedema. (Tr. 1197). She had been working off and on as a nanny, and had symptoms that included increased appetite, trouble concentrating, difficulty sleeping, low motivation, low self-esteem, crying spells, anxiety, fear and panic. (Tr. 1199). She was assessed with generalized anxiety disorder ("GAD") and post-traumatic stress disorder ("PTSD"). (Tr. 1203). Daroma further indicated that her occupational functioning was limited by low motivation on the job. (Tr. 1206).

On June 15, 2024, Daroma attended a mental consultative examination with Messeret Tewolde, PMHNP. (Tr. 1240-44). Daroma listed her chief complaints as anxiety and "IEP". (Tr. 1240). She indicated that she had first been diagnosed with anxiety at age seven, and that she had an IEP throughout her education. (*Id.*). She had been engaged in counseling for four months and found it helpful, but she did not like the prescribed medication and stopped taking it. (Tr. 1241). She was assessed with anxiety disorder due to another medical condition, and depressive disorder due to another medical condition, with major depressive-like episodes. (Tr. 1243).

### C. Medical Opinion Evidence

#### 1. State Agency Reviewing Opinion Evidence

On December 12, 2023, at the initial level, state agency reviewing physician Diane Manos, M.D., opined that Daroma was capable of performing work at the medium exertional level, but could only frequently climb ladders, ropes or scaffolds. (Tr. 91-92). On July 9, 2024, at the reconsideration level, state agency reviewing physician King Leong, M.D, opined that Daroma was capable of performing work at the light exertional level, except that she was limited to frequent climbing of ramps and stairs; occasional climbing of ladders, ropes or scaffolds; frequent balancing, stooping, kneeling or crouching; occasional crawling; she must avoid even

moderate exposure to fumes, dusts, odors, gases, poor ventilation, etc.; and must avoid even moderate exposure to hazards such as dangerous machinery and unprotected heights. (Tr. 110-13).

On July 8, 2024, at the initial level, state agency reviewing psychologist Sallie Boulous-Sophy, Ph.D, opined that Daroma had moderate limitations in the domains of understanding, remembering or applying information; interacting with others; concentration, persistence and maintaining pace; and adapting or managing oneself. (Tr. 108). Dr. Boutrous-Sophy further opined that Daroma was moderately limited in her ability to understand, remember and carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and to be punctual within customary tolerances; to work in coordination with or in proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; and to respond appropriately to changes in the work setting. (Tr. 113-14).

**2. Consultative examiner opinions**

On March 14, 2022, Dr. Wuebker opined that Daroma would be expected to understand and apply one-step workplace instructions, but more complex instructions would appear more difficult. (Tr. 462). Dr. Wuebker further assessed that testing showed some limitations in concentration and attention, but she would be capable of performing these skills in a work arena in line with her abilities. (*Id.*). He added that nothing that suggested she would have difficulty getting along with supervisors or coworkers, and no indication of adaptation limitations. (*Id.*).

On June 15, 2024, NP Tewolde opined that Daroma's short-term memory was intact, but her long-term memory was markedly impaired. (Tr. 1243). She further opined that Daroma's concentration and persistence were mildly impaired. (*Id.*). She judged Daroma's social limitations to be intact, and indicated that she had moderate problems in handling the pressures of the workplace. (*Id.*).

**D. Administrative Hearing Evidence**

Daroma testified before an ALJ on January 27, 2025. (Tr. 40-47). Daroma testified that she was 26 years old, and that she lived with her parents and two brothers. (Tr. 40). She is 5'7" tall and weighs 246 pounds. (*Id.*). She has a driver's license, though she does not drive when she feels like her blood pressure is low. (Tr. 40-41). She is a high school graduate, and she has worked as an assistant teacher in a daycare center. (Tr. 41).

Daroma testified that her struggles with learning rendered her unable to work. (Tr. 42). She is further limited by her lymphedema, as her legs will swell even if she sits with them propped up. (*Id.*). Her low blood pressure causes her to become lightheaded if she bends down then stands up too quickly. (*Id.*).

Daroma stated that she is capable of walking one or two city blocks, although she might need a short break after the first one. (Tr. 43). She can stand for half an hour, and can partially bend at the waist and squat. (*Id.*). She generally limits herself to lifting no more than 60 pounds. (Tr. 44). She can sit for half an hour at a time. (*Id.*). She can shower on her own, prepare only simple meals and do a minimal amount of household chores. (Tr. 44-45). Her hobbies include coloring, hanging out with friends and playing with her dog. (Tr. 45). She used to like going to the gym to exercise, but it became too difficult because of the swelling in her legs. (*Id.*). She used to participate in a church group but has not gone in some time. (Tr. 45-46).

Under questioning by her attorney, Daroma testified that when she sits, she props her legs up above her heart, and she uses a leg pump for at least an hour per day. (Tr. 46). The swelling is exacerbated by standing and moving, but she has been trying to address it with therapy and by wearing compression socks and good shoes. (Tr. 47). The swelling is primarily in her left leg, though her right leg does swell as well. (*Id.*). She added that her low blood pressure causes her to become lightheaded just about every time she bends over. (*Id.*) When that happens, she needs to lay down. (*Id.*).

Once Daroma's testimony concluded, VE Suman Srinivasan testified. (Tr. 48-54). The VE classified Daroma's past work as a daycare worker, DOT #359.677-018, SVP 4, generally performed at the light exertional level, actually performed at the very heavy exertional level. (Tr. 48). For her first hypothetical, the ALJ asked the VE to consider an individual of Daroma's age, education and work experience with the residual functional capacity for work at the light exertional level except that the individual could not climb ladders, ropes or scaffolds, and could only frequently climb ramps and stairs; the individual could frequently balance, stoop, kneel or crouch, but only occasionally crawl; could frequently use the bilateral lower extremities for pushing, pulling or operating foot controls; must avoid all exposure to moving mechanical parts, sharp unprotected implements, heavy equipment, commercial driving, open bodies of water and high, exposed places; must avoid more than occasional concentrated exposures to irritants such as fumes, odors, dust and gases; can perform no jobs that require job-related reading, and must be able to use an electronic calculator for any job-related mathematical calculations; can understand, remember and carry out simple instructions for work not requiring a specific production rate, such as assembly line work; no work requiring hourly quotas; is capable of using judgment to make simple work-related decision with occasional, explained in advance, and

slowly implemented changes in a routine work setting; can have no interaction with the general public, and is capable of only occasional interactions with co-workers and supervisors, meaning the individual is able to be in proximity of others, able to exchange greetings, and able to engage in discussions that do not require persuasion or involve tandem tasks that extend beyond a 30-day training period, and cannot involve persuasion, negotiation or conflict resolution duties. (Tr. 48-50).

The VE testified that the individual could not perform Daroma's past work, but could perform light, unskilled jobs such as an inspector and tester, DOT #559.687-074, with approximately 95,000 jobs in the national economy; as a marking clerk, DOT #209.587-034, with around 165,000 nationally; and as a collator operator, DOT #208.685-010, with around 30,000 jobs nationally. (Tr. 50-51).

For a second hypothetical, the ALJ asked the VE to consider all of the same circumstances of the first hypothetical, except that this individual would also require a sit-stand option under which the individual is able to alternate positions for one or two minutes in the immediate vicinity of the workstation, and more frequently than every thirty minutes, while remaining on task at least ninety percent of the work period. (Tr. 51). The VE opined that the same jobs would remain. (*Id.*). For a third hypothetical, the ALJ asked the VE to consider all of the same circumstances as the second hypothetical, except that this individual would be limited to the sedentary exertional level. (*Id.*). The VE opined that this individual could perform unskilled jobs at the sedentary exertional level, including as an inspector and tester, DOT #726.684-110, with approximately 11,000 jobs nationally; as a document preparer, DOT #249.587-018, with approximately 14,000 jobs nationally; and as a ticket counter, DOT #219.587-010, with around 8,000 jobs nationally. (Tr. 51-52).

For her final hypothetical, the ALJ asked the VE to further presume that the individual would be off-task more than ten percent of the time. (Tr. 52). The VE opined that there would be no jobs for such an individual at any exertional level because employers will tolerate no more than ten percent of the time off task. (Tr. 52-53). Further, employers would tolerate no more than one unscheduled absence per month. (Tr. 53). Under questioning by Daroma's attorney, the VE opined that an individual who has to elevate their legs above waist level at the workstation would be precluded from work. (Tr. 54).

**IV. The ALJ's Decision**

In her decision dated June 26, 2024, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2026.

2. The claimant has not engaged in substantial gainful activity since May 28, 2021, the alleged onset date (20 CFR 404.1571 *et seq*. and 416.971 *et. seq.*).

3. The claimant has the following medical impairments: lymphedema, obesity, borderline intellectual functioning/specific learning disability, generalized anxiety disorder, and neurocardiogenic syncope (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except postural limitations of no climbing of ladders, ropes, or scaffolds. Frequent climbing of ramps and stairs. Frequent balancing, stooping, kneeling, or crawling. Occasional crawling. Frequent use of bilateral lower extremities for pushing, pulling, and operation of foot controls. Environmental limitations to avoid all exposure to moving mechanical parts, sharp unprotected implements, heavy equipment, commercial driving, open bodies of water and high exposed places. Additional environmental limitations to avoid more than occasional, concentrated exposure to irritants such as fumes, odors, dust or gases. No jobs that require job related reading. Any job-related mathematical

> calculations must allow the use of electronic calculators. Can understand, remember and carry out simple instructions, for work not requiring a specific production rate, such as assembly line work, nor work requiring hourly quotas. Capable of using judgment to make simple work-related decisions, with occasional explained [*sic*] in advance, and slowly implemented changes in a routine work setting. No interaction with members of the public. Capable of occasional interaction with supervisors and coworkers. As superficial is not a vocationally defined term, assume that the hypothetical individual is able to be in proximity of others, able to exchange greetings, and able to engage in discussions that do not require persuasion or involve tandem tasks that extend beyond a 30-day training period. No persuasion, negotiation, or conflict resolution duties.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on November 24, 1998, and was 22 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education (20 CFR 404.1564 and 419.964).

9. Transferability of job skills is not material to a determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, that are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from May 28, 2021, through the date of this decision (20 CFR 404.1520(g) and 419.920(g)).

(Tr. 14-29).

## V. Law and Analysis

### A. Standard for Disability

Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits:

1. whether the claimant is engaged in substantial gainful activity;
2. if not, whether the claimant has a severe impairment or combination of impairments;
3. if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1;
4. if not, whether the claimant can perform their past relevant work in light of his RFC; and
5. if not, whether, based on the claimant's age, education, and work experience, they can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4)(i)-(v)[1]; *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The Commissioner is obligated to produce evidence at Step Five, but the claimant bears the ultimate burden to produce sufficient evidence to prove they are disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

### B. Standard of Review

This Court reviews the Commissioner's final decision to determine whether it is supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). However, the substantial evidence standard is not a high threshold for sufficiency. *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind

[1] The regulations governing DIB claims are found in 20 C.F.R. § 404, *et seq.* and the regulations governing SSI claims are found in 20 C.F.R. § 416, *et seq.* Generally, these regulations are duplicates and establish the same analytical framework. For ease of analysis, I will cite only to the relevant regulations in 20 C.F.R. § 404, *et seq.* unless there is a relevant difference in the regulations.

might accept as adequate to support a conclusion.'" *Id.* (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d at 241. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, this Court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012).

## VI. Discussion

Although not explicitly stated, Daroma appears to be raising a single issue for this Court's review, that being whether the RFC determination made by the ALJ was supported by substantial evidence. (ECF Doc. 7, pp. 3-5). More specifically, I construe Daroma's brief as a challenge to the ALJ's RFC findings, where he failed to include off-task allowances or her need to elevate her legs due to lymphedema. (*See id.* at p. 3). Daroma further argues that the ALJ failed to "fully consider the testimony of the vocational expert" when determining Daroma's RFC. (*Id.* at pp. 4-5).

The Commissioner retorts that the ALJ properly based his RFC finding on the evidence in the record as a whole, and that substantial evidence supported his decision. (ECF Doc. 8, p. 6). The Commissioner contends that the ALJ properly considered Daroma's testimony in formulating the RFC, but found it "not entirely consistent" with the medical evidence in the file. (*Id.*). Because Daroma does not directly challenge the ALJ's review of her subjective allegations, the Commissioner argues that she forfeits any such challenges. (*Id.*). The Commissioner avers that because the ALJ properly formulated his RFC finding, grounded his decision in the medical evidence, including the VE's testimony, and applied the correct legal standard, this Court is obliged to affirm his decision. (*Id.* at p. 8).

Before proceeding to Step Four of the sequential analysis, the ALJ is required to assess the claimant's RFC. 20 C.F.R. § 404.1520(e). The RFC is an assessment of a claimant's ability to work despite their impairments. *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p). An ALJ must consider all relevant evidence in the case record, including a claimant's severe and non-severe impairments. 20 C.F.R. § 404.1545(a)(2). Relevant evidence includes a claimant's medical history, medical signs,

laboratory findings, and statements about how the symptoms affect the claimant. 20 C.F.R. § 404.1529(a).

This Court's review of the ALJ's decision is "limited to determining whether it is supported by substantial evidence and was made pursuant to proper legal standards." *Napier v. Comm'r of Soc. Sec.* 127 F.4th 1000, 1004 (6th Cir. 2025) (citing *Rogers*, 486 F.3d at 241). "Substantial evidence is 'more than a scintilla of evidence but less than a preponderance;' it is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Rogers*, 486 F.3d at 241 *and Biestek*, 587 U.S. at 103 (2019). As long as the ALJ's findings are supported by substantial evidence, we may not second-guess them, even if substantial evidence would support the opposite conclusion. *Ulman v. Comm'r of Soc. Sec.*, 693, F.3d 709, 714 (6th Cir. 2012).

As an initial matter, I find the Commissioner's argument that Daroma has waived any argument concerning her subjective complaints, (ECF Doc. 8, p. 6), to be well-taken. A plaintiff waives any argument not raised in his merits brief. *See Swain v. Comm'r of Soc. Sec.*, 379 F. App'x 512, 517 (6th Cir. 2010) (affirming a district court's finding that a claimant waived arguments that he did not raise in his merits brief). Here, Daroma did not challenge the ALJ's finding that "the claimant's statements about the intensity, persistence, and limiting effects of his or her symptoms . . . are inconsistent because the claimant remains independent in her activities of daily living," and any challenge to that finding is relinquished. (*Compare* ECF Doc. 7 *with* Tr. 26). I therefore do not consider any alleged error regarding the ALJ's consideration of Daroma's subjective symptom testimony.

I further find that Daroma's argument that the ALJ "failed to fully consider essential vocational expert testimony" to be misguided. (ECF Doc. 7, p. 5). At Step Five, the ALJ has the

burden to prove that there is work in the national economy that the claimant can perform, and uses VE testimony to support these findings. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999). "The step five analysis is meant to determine, *given the severity of the impairments already proven*, whether there are jobs in the economy which a claimant can perform." *Id.* (emphasis added). A challenge to VE testimony therefore goes to the Step Five vocational analysis; using VE testimony to challenge whether a claimant's impairments warranted certain limitations in an RFC is misplaced. Furthermore, while Daroma is correct that the VE testified that limitations regarding significant time off-task and leg elevation would be work-preclusive (Tr. 52-54), the ALJ did not disregard or fail to consider that testimony. The ALJ merely determined that Daroma's RFC did not restrict her in a manner that would require those limitations. I therefore do not find error relative to these claims and turn now to consider the specific limitations Daroma contends were omitted from the RFC in error.

**1. Off-task allowances.**

Daroma claims that the ALJ's RFC determination was deficient in that it did not include off-task allowances.[2] (ECF Doc. 7, pp. 3-4). A review of the ALJ's decision, however, shows that the ALJ found persuasive the opinion of a consultative psychological examiner who "observed that the claimant's concentration and persistence was *mildly* impaired." (Tr. 25 (emphasis added)). In so finding, the ALJ noted that the consultative examiner's opinion was consistent with Daroma's self-reported activities of daily living, which had included driving, going out alone to shop, running errands, keeping appointments, playing games on her phone, surfing the internet and remaining in contact with others by phone or text. (*Id.*). While the ALJ found moderate limitations on Daroma's ability to concentrate, persist and maintain pace, (Tr.

[2] Daroma does not clarify the reasoning behind her alleged need for more than ten percent of time off-task. (*See generally* ECF Doc. 7).

22), which would affect her ability to stay on task during the workday, those limitations were addressed in the RFC by restricting her to simple instructions without a requirement for a specific rate nor hourly quotas. (Tr. 23). On this basis, therefore, the ALJ considered Daroma's ability to stay on task and included appropriate limitations in the RFC. The evidence noted in the decision is more than "a scintilla of evidence," and is therefore adequate to support the ALJ's determination not to include specific off-task allowances in the RFC.

**2. Leg elevation.**

Daroma further argues that the ALJ's RFC is fatally flawed in that it did not include a specific restriction requiring the ability to elevate her legs throughout the workday to address swelling caused by lymphedema. (ECF Doc. 7, pp. 3-4). The ALJ did, however, write in his decision, "[d]espite complaints of lymphedema in her left leg and left ankle and foot pain, the claimant has consistently presented with a normal posture and gait." (Tr. 26 (citing Tr. 471-522, 607-09, 661-62, 720)). Further, additional citations to the record in the ALJ's decision reference a left VL duplex lower extremity venous procedure that indicated that Daroma's DVT had cleared (Tr. 635-36), and a left foot MRI indicating only moderate soft tissue swelling along the dorsal and lateral aspect of the foot (Tr. 829, 867). Applying the low bar for substantial evidence that requires only "more than a scintilla of evidence" that "a reasonable mind might accept as adequate to support a conclusion" *Napier*, 127 F.4th at 1004, I find this statement, and the associated citations to the record, carry the ALJ's burden. The ALJ has built a logical and accurate bridge from the evidence to Daroma's RFC showing why, despite a lymphedema diagnosis, no limitation for leg elevation is justified. Accordingly, I do not recommend remand on this basis.

## VII. Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Daroma's applications for DIB and SSI be affirmed.

Dated: September 14, 2026

Reuben J. Sheperd
United States Magistrate Judge

---

## OBJECTIONS

**Objections, Review, and Appeal**

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge. Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C 636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

***

Failure to file objection within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendations. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard*

*v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991) Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act." *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, 2 (W.D. Ky. June 15, 2018) quoting *Howard*. The failure to assert specific objections may in rare cases be excused in the interests of justice. *See United States v. Wandashega,* 924 F.3d 868, 878-79 (6th Cir. 2019)